Robert REYNOLDS and Mrs. Robert Reynolds, Appellants,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Jan. 30, 1959.

Pleaz Wm. Mobley, Mt. Vernon, for appellants.

Jo M. Ferguson, Atty. Gen., David B. Sebree, Asst. Atty. Gen., for appellee.

BIRD, Judge.

Robert Reynolds and his wife were tried and convicted of the offense "of unlawfully and wilfully setting up and maintaining a common public nuisance." They were fined $200 and have moved for an appeal to this Court. We need to answer only one question on this appeal. Did the court err in denying a directed verdict for defendants?

Specifically the indictment charges that the defendants did "unlawfully, wilfully, and knowingly suffer and procure and permit divers idle and evil disposed persons to habitually frequent and assemble in a certain house in the defendants' possession and under their control and there to remain and habitually and unlawfully curse and swear, talk loud and boisterously, playing a juke box at a high pitch to all hours of the night, fighting and offering to fight, being and becoming drunk or intoxicated, whooping and hollering and otherwise misbehaving themselves."

The place about which the complaint is made is actually a small restaurant situated almost directly across the street from the Mt. Vernon Grade and High School. It is frequented by students and so far as the record discloses neither parents nor school authorities have complained about the manner of its operation.

Two city policemen and one state policeman were introduced by the Commonwealth. They each testified that the reputation of the place was bad but in each instance those with whom they had discussed the matter had heard that someone did a "striptease" in the place. There is no proof in the record that the "striptease" occurred and no one told the officers they had seen it. If it did in fact occur there is nothing in the record to indicate that there was ever a repetition of that act or that any other act of indecency ever occurred. From the testimony we must conclude that if the striptease did occur it was a single isolated instance of misconduct within the place. The officers who frequently visited the place in the performance of their duties testified that they never at any time saw any misconduct within the place of business. One young teenager was arrested for drunkenness on the outside of the place. He was taken before a judge and released with no charge being made against him. It is indicated in the record that this happened on the night of a basketball game and there is nothing to show that he was ever a patron of the place or that he was about to be. That is the only instance of that kind in the record. The officers stated that no one had complained about being disturbed by the manner in which the place was operated but out of curiosity some had suggested that they investigate because of the number of parked cars and the number of people who congregated there. It is in the record that they did investigate and found nothing about which they might make a complaint. It is in the record that the defendants complained to the officers about girls and boys spending most of the night in junked automobiles behind their place of business. There is nothing to show that the junked cars were on defendants' premises and further there is nothing to show that the offending parties were, or had ever been, patrons of the place in question, and there is nothing to show the proximity of these cars to the place of business. There is nothing of substance in this record to show any immoral conduct in or upon the defendants' premises.

One neighbor, a former mayor and citizen of good repute, testified in the case. His testimony is as follows:

"Q 10. I wish you would describe just what you have heard and seen there, what goes on over there? A. Well, large crowds of school children congregate, that's at night.

"Q 11. That is at night time? A. Yes, sir, and automobiles park on each side of the street and pass going to and from the place of business.

"Q 12. Are there many or few automobiles parked there? A. Many.

"Q 13. Tell the jury what effect that has on the ability to travel that street? A. Well I have seen the time that you could hardly get through it.

"Q 14. Have you heard any unusual noises? A. Juke box and victrola.

"Q 15. And you are a hundred and fifty yards away? A. Yes, sir.

"Q 16. How late at night do you hear this juke box or victrola? A. Ten or ten thirty.

"Q 17. Would that be on week nights or Saturday and Sunday nights? A. I have heard it every night.

"Q 18. Does any dancing go on over there? A. I never have seen it.

"Q 19. You don't frequent the place yourself? A. No.

"Q 30. Tell the jury whether or not this great congregation of people and parking like they do and this loud juke box going, whether or not that disturbs you? A. Yes, sir, it does, at times, not every night but some nights it does.

"Q 7. Why do you think they are carrying on bad there now? A. From the congregating around the building and the going in and out."

This witness complains of the road being blocked. That is a traffic problem created perhaps because of the operation of the place but not necessarily because of the manner of its operation. This situation may exist at any place of business, good or bad, and is not evidence of nuisance. That is a traffic problem directed to the police. He does not complain of any loud and boisterous talk as is charged in the indictment. He simply says that on some nights he is disturbed by the juke box. No other person testified that he was in any manner disturbed by noise or music emanating from the place. If the disturbance about which the witness complains creates any nuisance, there is nothing to show that such disturbance is to the "common nuisance and annoyance of citizens of the neighborhood" as alleged in the indictment, and would not therefore of itself create a public offense.

There is no testimony in this case showing that the persons who habitually frequent the place are "idle or evil disposed" as charged in the indictment. The record shows that the place has been in operation for about six years and that on one occasion two girls fought each other on the outside of the place and that on the same occasion two boys also fought on the outside. It is in the record that one girl had heard vulgar talk in the restaurant. It is not shown whether the language was spoken privately by her or to her, or spoken so as to be heard by other patrons of the place, and it is not shown by the record that the use of vulgar language was a general thing in or around the place. The record actually indicates that it was not the usual thing because one witness for the Commonwealth testified that she was told to leave the place because of dirty talk.

There is some vague testimony that persons have been seen there who were under the influence of intoxicants. There is no proof that anyone smelled alcohol or saw any staggering in the place, and there is no definite proof that anyone saw the drinking of intoxicating liquors in or around it. The witness who undertook to testify on this point simply said that some hollering brought about this conclusion that the parties were drinking. If there was such hollering, there is nothing in the record to show that anyone was disturbed by it and, further, it is well known that kids will whoop

and holler without the assistance of liquor. The evidence of drinking is too vague to be of probative value. There is nothing in the record to indicate that the place has ever been engaged in the liquor business. No witness testified that any patron, occasional or regular, had a bad reputation for morals and no witness testified that any immoral act was ever committed in or upon the premises. It will be noted that the closing hours of the place are quite reasonable.

The strongest evidence in this case is given by reputable people pertaining to the reputation of the place and that evidence, upon close scrutiny, is limited and qualified.

■ Regardless of the potency of the testimony a conviction upon the charge of maintaining a public nuisance cannot be sustained upon bad reputation alone. It must be corroborated by substantive evidence. King v. Commonwealth, 154 Ky. 829, 159 S.W. 593, 48 L.R.A.,N.S., 253. The corroborating testimony necessary to sustain this type of charge must be of such nature as to show a continuity and repetition of acts of disorder. Commonwealth v. Bessler, 97 Ky. 498, 30 S.W. 1012; Collins v. Commonwealth, 219 Ky. 494, 293 S.W. 963.

■ It is the opinion of the Court that the evidence in this case fails to meet the requirements of the foregoing authorities. At the most, it raises no more than a suspicion of guilt and one cannot be subjected to the penalties of the criminal law upon guess, surmise, speculation or suspicion. Crabtree v. Commonwealth, 260 Ky. 575, 86 S.W.2d 301; Conley v. Commonwealth, 265 Ky. 78, 95 S.W.2d 1094. Under the authorities cited we are constrained to hold that, the evidence is not sufficient and that the motion for directed verdict should have been sustained.

The motion for appeal is therefore sustained and the judgment reversed.